UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTURION REAL ESTATE PARTNERS, LLC, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>ARCH INSURANCE COMPANY,<br><br>    Defendant. | Case No. 16-cv-00218-VC<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The Parties

1. Centurion Real Estate Partners, LLC; Centurion Real Estate Investors IV, LLC; and Mission Place, LLC (collectively, the "MP Parties") are affiliated entities involved in real estate investment. Ex. 372 at 28:3-10, 29:23-31:5, 34:2-18.

2. American Guarantee & Liability Insurance Company is an insurance company that issued Commercial Umbrella Liability Policy AUC 9007010-01 covering the MP Parties. Ex. 207.

3. Zurich American Insurance Company, an insurance company affiliated with American Guarantee, issued Commercial General Liability Policy ACO 8309548-10 covering the MP Parties. Ex. 206.

4. Westchester Surplus Lines Insurance Company is an insurance company that issued Commercial General Liability Policy GLW786230 covering the MP Parties. Ex. 280.

5. Arch is an insurance company that issued Private Company Management Liability Insurance Policy PCD0015105-00 covering the MP Parties. Ex. 3.

### The Beacon Complex

6. In December 2004, the MP Parties purchased a mixed-use building complex located at 250 and 260 King Street in San Francisco, California, referred to as the "Beacon Complex" or the "Project." Ex. 46 at ARCH0000011.

7. The MP Parties purchased the Beacon Complex after construction on the Project was completed and played no role in the development, design, or construction of the Project. Ex. 46 at ARCH0000011 & ARCH0000015; Ex. 318 at 8:18-20; Ex. 321 at 10:19-21; Ex. 351 at 11:21-24; Ex. 352 at 8:18-20; Ex. 353 at 8:18-20; Ex. 354 at 11:21-24; Ex. 355 at 9:12-14; Ex. 356 at 5:15-18; Ex. 372 at 103:11-13.

8. After purchasing the Beacon Complex, the MP Parties began selling the residential units as condominiums. Ex. 46 at ARCH0000011-12 & ARCH0000015; Ex. 372 at 28:3-10, 29:23-30:5.

### The Underlying Actions

9. In August 2006, a group of condominium owners from the Beacon Complex sued the MP Parties along with affiliates of the entities that constructed and originally owned the Beacon Complex in the lawsuit styled *Zucker v. Catellus Development Corp.*, San Francisco Superior Court Case No. CGC-06-455352 ("*Zucker I*"). Dkt. No. 99 at 3 (Stipulated/Undisputed Facts at (a) & (b)); Ex. 59.

10. In January 2008, a group of condominium owners from the Beacon Complex sued the MP Parties along with The Mark Company and affiliates of the entities that constructed and originally owned the Project in the lawsuit styled *Zucker v. Catellus Development Corp.*, San Francisco Superior Court Case No. CGC-08-471272 ("*Zucker II*"). Dkt. No. 99 at 3 (Stipulated/Undisputed Facts at (a) & (b)); Ex. 61.

11. In August 2008, the homeowners association from the Project sued the MP Parties along with affiliates of the entities that designed, constructed, and originally owned the Project in the lawsuit styled *Beacon Residential Community Assoc. v. Catellus Third and King, LLC*, San Francisco Superior Court Case No. CGC-08-478453. Dkt. No. 99 at 3

(Stipulated/Undisputed Facts at (a) & (b)); Ex. 62.

12. *Zucker I*, *Zucker II*, and *Beacon* (the "Underlying Actions") each contain allegations of construction defects at the Project and that due to the design and construction of the residential units and the ventilation systems at the Beacon Complex, the residential units would become excessively hot and stuffy ("Heat Gain"). Exs. 59, 61-62. Each of the Underlying Actions also contained defects lists detailing the various issues with the buildings. Ex. 59 (Complaint at Ex. 3); Ex. 61 (Complaint at Ex. 3); Ex. 62 (Complaint at Exs. A-F).

13. The plaintiffs in the Underlying Actions alleged that because of the Heat Gain problem, the residential units would periodically become uninhabitable and the residents would have to vacate the units. Ex. 59 (Complaint at Ex. 3); Ex. 60 (Complaint at Ex. 5); Ex. 61 (Complaint ¶ 178 & Ex. 3); Ex. 62 (Complaint ¶ 38(B)).

14. The residents in the Project also alleged that Heat Gain caused the floors in their units to become warped and windows to crack. Ex. 62 (Complaint ¶ 38(B)); Ex. 361 at 84:9-16.

The Commercial General Liability Insurance Policies

15. The Zurich Policy and the Westchester Policy are based on the same form, CG 00 01 10 01, and therefore the relevant policy language is identical. Exs. 206 & 280. The insuring agreement in each policy states in relevant part, "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages." Ex. 206 at MP000119; Ex. 280 at MP000254. Property damage is defined to include both "Physical injury to tangible property, including all resulting loss of use of that property" as well as "Loss of use of tangible property that is not physically injured." Ex. 206 at MP000133; Ex. 280 at MP000268. Property damage is covered under the Zurich Policy and Westchester Policy if it is caused by an "occurrence," (that is, "an accident, including continuous or repeated exposure to substantially the same general harmful conditions"), and the property damage

3

occurs during the policy period.  Ex. 206 at MP000119, MP000132; Ex. 280 at MP000254, MP00267.

The Arch Insurance Policy

16. The first page of the Arch Policy states in bold letters that are in all-caps, "THE POLICY DOES NOT PROVIDE FOR ANY DUTY OR OBLIGATION ON THE PART OF THE INSURER TO DEFEND THE INSURED PERSONS OR THE PRIVATE COMPANY." Ex. 3.  The Arch Policy's coverage agreement is found in Section I.  The coverage provision in Coverage C states in relevant part: "Arch will pay on behalf of the MP Parties a Loss for which the MP Parties shall become legally obligated to pay as a result of a Claim first made during the Policy Period . . . against the MP Parties for a Wrongful Act which takes place during or prior to the Policy Period."  Ex. 3 (Section I, Coverage C).

17. Section X of the Arch Policy concerns defense costs and states in pertinent part, "Arch does not assume any duty to defend any Claim."  Ex. 3 (Section X).

18. Although the Arch Policy does not impose on Arch a duty to defend, it does obligate Arch to "advance, at the written request of the MP Parties, covered Defense Costs excess of the applicable Retention prior to the final disposition of a Claim."  Ex. 3 (Section X). "Advancing" defense costs does not mean paying defense costs before they are incurred; it means paying defense costs incurred in defense of covered claims before the claims are finally adjudicated or settled.

19. The Arch Policy defined "Defense Costs" to mean "reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the defense and appeal of a Claim against the Insureds, but shall not include salaries, wages, overhead or benefit expenses associated with Insured Persons or employees of the Private Company."  Ex. 3 (Section II, (d)).

The Insurance Companies' Response

20. The MP Parties provided Westchester, Zurich, and American Guarantee notice of the Underlying Actions. Ex. 209 at Z004098; Ex. 247 at ARCH0005556.

21. Zurich responded to the MP Parties' notice by acknowledging that the Underlying Actions alleged property damage potentially covered under its policy. Ex. 209 at Z004098. Zurich agreed to defend the MP Parties in the Underlying Actions subject to a reservation of rights and retained the law firm Haight, Brown & Bonesteel, LLP to represent the MP Parties in the Underlying Actions. Dkt. No. 99 at 3 (Stipulated/Undisputed Facts at (e)); Ex. 209 at Z004080-4081; Ex. 369 at 52:5-17.

22. Zurich also agreed that the MP Parties were entitled to *Cumis* counsel under California Civil Code Section 2860 and provided the MP Parties with the usual "panel rates" Zurich pays in defense of similar cases in San Francisco County. Ex. 209 at Z004080-4081; Ex. 366 at 73:21-25.

23. Instead of relying solely on counsel appointed by Zurich and Westchester, the MP Parties chose also to retain independent *Cumis* counsel. The MP Parties selected the law firm Wendel Rosen Black & Dean, LLP to serve as their *Cumis* counsel in the Underlying Actions. Dkt. No. 99 at 3 (Stipulated/Undisputed Facts at (g); Ex. 209 at Z004080-4081; Ex. 361 at 21:10-19; Ex. 369 at 52:24-53:1; Ex. 373 at 53:10-25.

24. Zurich also informed the MP Parties that American Guarantee had opened a claim file for the Underlying Actions but that coverage under the American Guarantee Policy was not triggered because that policy only provided excess coverage. Ex. 209 at Z004082-4083.

25. Westchester responded to the MP Parties' notice by acknowledging that the Underlying Actions alleged property damage potentially covered under its policy. Ex. 247 at ARCH0005556. Westchester agreed to defend the MP Parties in the Underlying Actions subject to a reservation of rights and initially retained the law firm Lewis Brisbois Bisgaard & Smith, LLP to represent the MP Parties in *Zucker I*. Dkt. No. 99 at 3 (Stipulated/Undisputed Facts at (f)); Ex. 247 at ARCH0005540 & ARCH0005556; Ex.

5

361 at 27:3-9; Ex. 363 at 56:7-9; Ex. 367 at 15:2-9, 16:24-17:5.

26. Unlike Zurich, Westchester maintained that the MP Parties were not entitled to *Cumis* counsel. Ex. 214; Ex. 217; Ex. 266 at ACE000152; Ex. 363 at 59:20-61:5.

27. Haight, Lewis Brisbois, and Wendel Rosen concurrently represented the MP Parties in *Zucker I* until June 2008, when Zurich and Westchester agreed to consolidate the defense of the MP Parties through Haight, and Lewis Brisbois withdrew as counsel for the MP Parties. Dkt. No. 99 at 3 (Stipulated/Undisputed Facts at (h)); Ex. 214; Ex. 215 at P001660; Ex. 217; Ex. 361 at 29:11-15; Ex. 363 at 56:7-13.

28. After Lewis Brisbois withdrew as counsel for the MP Parties, Haight and Wendel Rosen continued to represent the MP Parties in each of the Underlying Actions. Dkt. No. 99 at 3 (Stipulated/Undisputed Facts at (j)); Ex. 221 at P000038.

29. In early 2013, the MP Parties were no longer willing to pay Wendel Rosen to serve as *Cumis* counsel in the *Beacon* matter – the only Underlying Action still active at that time. Ex. 221 at P000038-39; Ex. 373 at 55:8-56:9. The MP Parties did not demand in writing that Arch advance defense costs for the defense Wendel Rosen was providing the MP Parties, but instead requested Wendel Rosen to withdraw as *Cumis* counsel. Ex. 374 at 201:10-11; Ex. 221 at P000038; Ex. 222; Ex. 358; Ex. 359.

30. In March 2013, Wendel Rosen withdrew as counsel of record for the MP Parties in *Beacon*. Ex. 222; Ex. 358; Ex. 359. After Wendel Rosen withdrew, Haight was the only counsel of record for the MP Parties. Dkt. No. 99 at 3 (Stipulated/Undisputed Facts at (j) & (k)); Ex. 221 at P000038; Ex. 361 at 53:20-54:16.

<u>The Mark Company's Indemnification Demand</u>

31. After being named a defendant in *Zucker II*, The Mark Company demanded that the MP Parties indemnify and defend The Mark Company in that action. Ex. 32.

32. The MP Parties informed Arch of the indemnification demand and requested that Arch consent to Wendel Rosen's representation of The Mark Company in *Zucker II*. Ex. 32. The MP Parties also informed Arch of the rates Wendel Rosen would charge for The

6

Mark Company's defense. *Id.*

33. Arch responded by letter on April 27, 2010, stating that it consented to Wendel Rosen's representation of The Mark Company in *Zucker II* and to the rates Wendel Rosen would charge for The Mark Company's defense. Ex. 32 at ARCH0001503. This letter constituted an acknowledgment by Arch, subject to a reservation of rights, that the *Zucker* actions fell within the MP Parties' policy. Although the communications between the parties are ambiguous, this letter and the surrounding communications are best understood as a meeting of the minds between the parties that Arch would cover defense costs incurred by the MP Parties. In other words, it was consent to use the Wendel Rosen firm as defense counsel in the litigation, subject to invoices being submitted to Arch so that Arch could review the reasonableness of the expenses.

The Underlying Actions Settle

34. *Zucker I* and *Zucker II* were both dismissed in September 2012. None of the Plaintiffs made any settlement payments in *Zucker I* or *Zucker II*. Ex. 369 at 88:7-89:23.

35. In September 2015, a settlement agreement was reached in *Beacon*. Ex. 13. The $17,575,000 settlement amount in *Beacon* was divided amongst the defendants and their insurance companies as follows:

   a. $6,750,000 paid by Lexington Insurance Company on behalf of the entities that designed the Beacon Complex;

   b. $6,750,000 paid by National Union on behalf of the entities that constructed the Beacon Complex;

   c. $300,000 paid by Continental Insurance Company on behalf of Window Solutions; and

   d. $3,775,000 paid by and on the behalf of the MP Parties.

Ex. 13 at MC000936; Ex. 318 at 6:1-7:1; Ex. 321 at 7:27-9:1; Ex. 351 at 8:22-9:25; Ex. 352 at 6:1-7:1; Ex. 353 at 6:1-7:2; Ex. 354 at 8:22-9:25; Ex. 355 at 2:2-3:5, 6:13-7:16; Ex. 356 2:17-3:20, 6:13-7:16; Ex. 369 at 148:6-10.

36. Altogether, $13,500,000 of the $17,575,000 *Beacon* settlement (approximately 77%) was paid on behalf of the entities that designed and built the Project. Ex. 13 at MC000936; Ex. 318 at 6:1-7:1; Ex. 321 at 7:27-9:1; Ex. 351 at 8:22-9:25; Ex. 352 at 6:1-7:1; Ex. 353 at 6:1-7:2; Ex. 354 at 8:22-9:25; Ex. 355 at 2:2-3:5, 6:13-7:16; Ex. 356 2:17-3:20, 6:13-7:16.

37. The $3,775,000 paid by and on the behalf of the MP Parties was divided amongst the Plaintiffs as follows:
    a. MP Parties – $300,000;
    b. Zurich – $995,000;
    c. American Guarantee – $305,000; and
    d. Westchester – $2,175,000.

    Dkt. No. 99 at 4 (Stipulated/Undisputed Facts at (d)); Ex. 234.

    <u>Defense Costs</u>

38. In addition to paying Haight to defend the MP Parties, Zurich also paid the MP Parties' *Cumis* counsel, Wendel Rosen, at the Zurich panel rates. Ex. 209 at Z004081; Ex. 211 at P002486; Ex. 216; Ex. 229 at P002168; Ex. 366 at 90:20-22; Ex. 373 at 21:8-18.

39. Altogether, Zurich paid $2,339,696 in defense costs in the Underlying Actions. Dkt. No. 99 at 4 (Stipulated/Undisputed Facts at (c)).

40. Wendel Rosen's billing rates exceeded the Zurich panel rates. Ex. 229 at P002168 (listing Zurich's panel rates at $175 for partners, $150 for associates, and $95 for paralegals and Wendel Rosen's rates of $470 for partners, $320 for associates, and $165 for paralegals). The MP Parties paid the difference between what Wendel Rosen charged and the Zurich panel rates. Ex. 229 at P002168; Ex. 369 at 53:4-8, 96:13-24; Ex. 372 at 47:24-48:24; Ex. 373 at 74:1-18.

41. The MP Parties paid $989,484 in defense costs in the Underlying Actions, all of which were paid to their *Cumis* counsel, Wendel Rosen. Dkt. No. 99 at 4 (Stipulated/Undisputed Facts at (c)); Ex. 372 at 47:24-48:24. However, a check from

Zurich to Wendel Rosen in the amount of $122,430.75 for defense costs in the Underlying Actions was endorsed over to the MP Parties thereby reducing the net defense costs the MP Parties paid from $989,484 to $867,053.25. Ex. 373 at 76:6-79:13.

42. If the MP Parties had selected *Cumis* counsel that billed at the Zurich panel rates, they would have had both a defense provided by Zurich and Westchester and a defense through independent *Cumis* counsel without incurring any defense costs. *Id.*; Cal. Civ. Code § 2860(c). However, it was not unreasonable for the MP Parties to select *Cumis* counsel that billed at higher rates.

43. Altogether, Westchester paid $1,755,551 in defense costs in the Underlying Actions. Dkt. No. 99 at 4 (Stipulated/Undisputed Facts at (c)).

44. Plaintiffs also seek to recover defense costs paid to Wendel Rosen after it withdrew as counsel of record in March 2013. Ex. 373 at 58:13-59:22. These defense costs are not covered. Although, as discussed in Paragraph 33, the Court construes the ambiguous communications between Arch and the MP Parties in 2010 as reflecting Arch's consent for Wendel Rosen to serve as defense counsel for the MP Parties in the litigation, those communications cannot possibly be construed as consent by Arch to continue paying Wendel Rosen's bills after Wendel Rosen withdrew as defense counsel in the litigation. At that point, if the MP Parties believed that any fees to be paid Wendel Rosen for work performed behind the scenes would continue to constitute "defense costs" that Arch was required to advance under the terms of the policy, the MP Parties would have needed to seek Arch's consent to the advancement of these alleged "defense costs." Because the MP Parties did not do so, Arch had no contractual obligation to cover these costs. (In any event, a significant portion of the fees incurred by Wendel Rosen after March 2013 could not possibly have been defense costs. Ex. 340 at MP019221-MP019331.)

45. The invoices in the record show that Mission Place, LLC paid Wendel Rosen $123,360.82 after March 2013 for defense costs. Ex. 340 at MP019221-MP019331; *see also* Dkt. No. 130. Since Arch had no obligation to cover these costs, this amount must

be subtracted from the total defense costs. Therefore, the net defense costs paid by the MP Parties in the underlying litigation relevant for the purposes of allocation to Arch are $867,053.25 less $123,360.82, or $743,692.43.

46. Arch's expert witness, Justice Cruz Reynoso, analyzed the invoices for Haight, Wendel Rosen, and Lewis Brisbois in the Underlying Actions. In his testimony and in his report, Justice Reynoso did not adequately explain why the Lewis Brisbois bills should be deemed excessive or duplicative. Exs. 319, 371. Nor does the documentary evidence to which Arch points establish that Lewis Brisbois's work was unnecessary or duplicative. Exs. 215, 253. As a result, the defense costs incurred by Lewis Brisbois will not be excluded.

Allocation

47. While the Underlying Actions were being litigated, the Plaintiffs continually indicated that the MP Parties' exposure in the Underlying Actions was entirely or almost entirely limited to Heat Gain.

48. A December 12, 2007 claim comment from Zurich's claim handling file concerning a proposed tolling agreement in the Underlying Actions states in part, "The HOA wants the stay in order to attempt repairs to the window ventilation issue, which at this point is the key HOA issue." Ex. 227 at P000086. Thus, as of December 12, 2007, Zurich believed the Heat Gain issue was the key issue in the Underlying Actions.

49. An October 1, 2008 claim comment from Westchester's claim file in *Beacon* states in part, "The biggest issue in this litigation continues to be the windows. The units on the east, south and west sides of the buildings have a problem with oppressive heat during the summer and fall. There is no AC in the units and the design apparently does not allow for window openings in order to create a breeze." Ex. 349 at P002508. Thus, as of October 1, 2008, Westchester believed that the biggest issue in *Beacon* – and hence the MP Parties' primary exposure – was Heat Gain.

50. In an October 16, 2008 email from Wendel Rosen's Peter Laufenberg, the MP Parties'

*Cumis* counsel, to William Lutz, Arch's coverage counsel in the Underlying Actions, Laufenberg stated that he agreed that Webcor, the general contractor, "appears to be generally taking responsibility for construction defects (leaks, cracks, etc.)" but is disavowing responsibility for the "window-related defects," because those defects should be the responsibility of the design defendants. Ex. 118. The Court finds that the reference to "window-related defects" concerns the Heat Gain issue. Thus as of October 16, 2008, the MP Parties' *Cumis* counsel believed that liability for non-Heat-Gain related defects would be borne by Webcor and not the MP Parties.

51. A February 18, 2009 claim comment from Zurich's claim handling file states in part, "While the original developer and builder will be expected to fund repairs of most items, the MP Parties will be potentially liable for heat gain repairs." Ex. 228 at P000073.

52. A Westchester Claim Loss Report dated May 29, 2014 states in relevant part, "During the condominium conversion process, the MP Parties installed a film on the existing windows in all the units to deflect the sunlight and deal with the overheating. . . . We believe that the only issue that the insured has exposure to is the film damaging the windows, which was done after they acquired the project." Ex. 283. The application of film on windows to deal with overheating concerns the Heat Gain issue. Thus, as of May 29, 2014, Westchester believed that the MP Parties exposure was limited only to Heat Gain.

53. A July 7, 2014 claim comment from Westchester's claim file in *Beacon* states in part that "the main contention in the complaint is sic related to damages and defects is 'solar heat gain' which makes the units uninhabitable. – problems with ventalation sic, substandard windows." Ex. 285. Thus, as of July 7, 2014, Westchester believed that the main issue in *Beacon* – and hence the MP Parties' primary exposure – was Heat Gain.

54. In a letter dated May 8, 2015, the MP Parties made a policy-limit demand on Arch in connection with the *Beacon* settlement. The MP Parties' letter stated in part that "the key issue in the case is . . . 'Solar Heat Gain.' Basically, the Plaintiffs allege that the vast

11

majority of the units are too hot." Ex. 46 at ARCH0000014. The letter added that "the MP Parties did not design, develop or build the project. It purchased the project after it was completed and then sold the units to the public. The MP Parties' liability, if any, would be its exposure as a seller . . . . During the sales process to the public, the MP Parties disclosed to the prospective buyers that some of the units could become uncomfortably warm on sunny days. . . . However, the essential claim against Mission Place is that the disclosure was inadequate." Ex. 46 at ARCH0000015. The letter then contained six pages of evidence that, "show the *Beacon* plaintiffs' theory of the case, namely that as a result of 'heat gain,' the units are often times uninhabitable and that these conditions have caused the unit owners to allege that their units have lost value and/or not appreciated like other condominium units." Ex. 46 at ARCH0000017-23. Thus, as of May 8, 2015, the MP Parties contended that the essential claim against the MP Parties in *Beacon* – and thus their exposure – was based on the Heat Gain issue.

55. Plaintiffs' discovery responses in this lawsuit also demonstrate that the MP Parties' exposure in the Underlying Actions was exclusively or nearly exclusively limited to the Heat Gain issue. *See* Ex. 321 at 9; Ex. 351 at 10; Ex. 355 at 3; Ex. 356 at 4.

56. In their interrogatory responses, each of the plaintiffs discussed how the *Beacon* Court had issued orders finding that Webcor and HKS owed the MP Parties a duty to indemnify and defend in *Beacon* and that the MP Parties "had a strong argument that the Catellus entities, HKS, Webcor, and the subcontractors had to bear all or most of the fault for plaintiffs' claims under equitable theories" because the MP Parties didn't design or construct the Project. Plaintiffs all stated that as a result, the MP Parties "had strong arguments that liability should be shifted to the other defendants under equitable theories of indemnity and/or contribution," but that these arguments "were weak" when it came to "the unit temperature and ventilation issue." Ex. 318 at 8; Ex. 321 at 10; Ex. 351 at 11; Ex. 354 at 11; Ex. 355 at 5; Ex. 356 at 9. Based on these arguments, Plaintiffs all stated in their interrogatory responses that "the entirety of Mission Place's contribution of

$300,000 to the *Beacon* settlement is allocable to alleged damage related to unit temperature and ventilation." Ex. 321 at 11; Ex. 351 at 12; Ex. 354 at 12; Ex. 355 at 5; Ex. 356 at 6. Zurich, American Guarantee, and Westchester also stated in their discovery responses in this action that "the *most appropriate* allocation of the settlement payment by those Plaintiffs is 90% to unit temperature and ventilation related damages. At a minimum, no less than 55% of the settlement payment by Zurich, American Guarantee and Westchester must be allocated to alleged damage related to unit temperature and ventilation." Ex. 318 at 9; Ex. 352 at 9; Ex. 353 at 9 (emphasis added).

57. Plaintiffs' initial interrogatory responses, Exhibits 318, 321, and 351 – 354, each contain a sheet attached after the signature block which states, "Verification to Follow." The parties do not dispute that further verification was never provided for these discovery responses. Dkt. No. 124, Trial Transcript at 29:22-24 & 99:4-13. However, each of the discovery responses was signed and attested to by Plaintiffs' counsel.

58. In addition, each of the plaintiffs provided supplemental interrogatory responses, Exhibits 355 and 356, which do not contain a sheet which says, "Verification to Follow" and do not otherwise indicate that further verification was necessary. As with the earlier interrogatory responses, Exhibits 355 and 356 are both signed and attested to by Plaintiffs' counsel. Moreover, the answer to Interrogatories 5 and 6 in Exhibits 355 and 356 are identical to or substantively identical to the answers to Interrogatory 7 in Exhibits 318, 321, and 351 – 354, with the exception that Exhibits 318, 352 and 353 provide an allocation of the settlement payments by Zurich, American Guarantee and Westchester to the Heat Gain issue, whereas the remaining initial interrogatory responses and the supplemental interrogatory responses all provide an allocation of the settlement payment by the MP Parties to the Heat Gain issue.

59. Under Federal Rule of Civil Procedure 33(b)(1)(B), interrogatories served on a corporation must be answered by any officer or agent of the corporation. The signature of a corporation's attorney satisfies this requirement. *Carramerica Realty Corp.*, 2010

13

WL 2629760, at *3; *Thomas v. Garcia*, No. 1:08-CV-00689-JLT PC, 2013 WL 3773861, at *3 (E.D. Cal. July 17, 2013). Even if the interrogatory responses were unverified, such that they may not be binding on the responding parties, they have some evidentiary value and the Court deems them admissible for consideration with all the other evidence in the case.

60. Plaintiffs' expert, Jozef Kneppers, performed an analysis in which he determined that of the *Beacon* plaintiff's claimed damages, $22,169,547.70 was attributable to the Heat Gain issue. Ex. 375 at 3. Kneppers allocated $7,315,950.74 of these Heat Gain damages to the MP Parties and allocated the remaining Heat Gain damages to the architect and designers of the condominium complex. Ex. 375 at Ex. A-3. Kneppers also allocated $2,696,055.09 in non-Heat-Gain damages to the MP Parties. Based on this allocation, Kneppers determined that 73% of the MP Parties' exposure in *Beacon* is attributable to Heat Gain. Ex. 375.

61. However, Kneppers's estimate that 73% of the MP Parties' exposure in *Beacon* is attributable to heat gain does not merit much weight in estimating the amount Arch owes the plaintiffs in the present litigation. Kneppers first arrived at this 73% estimate in 2015, in connection with a report he prepared in the *Beacon* action when he was asked to serve as an expert witness for the developers of the Beacon Complex project. Trial Transcript at 32:20-33:19. This means that at the time Kneppers was preparing these numbers, Kneppers (whose trial testimony demonstrated that he is inclined to offer results-driven opinions) would have had an incentive to arrive at a lower estimate of the percentage of the claimed damages in the *Beacon* action that were attributable to heat gain, because it would reduce the eventual settlement contribution that his client – namely, the developer of the building complex (Catellus) – might be required to pay. And a lower estimate for the portion of claimed damages attributable to heat gain would have increased the amount that the MP Parties owed, because the MP Parties were also defendants in the underlying *Beacon* action and specifically, the MP Parties were the entities that had bought the

14

Beacon Complex from the developers and then sold off the individual units. In fact, Kneppers had specifically been retained by the developers to allocate damages among three groups of defendants – the builders and developers, the architects and designers, and the MP Parties. Trial Transcript at 34:15-35:16.

62. The same 73 percent figure was the basis for Kneppers' first report in this litigation. But after this Court ruled at summary judgment that the heat gain claims were not covered, Kneppers offered a new opinion with a new allocation. Because it is results-driven, the Court gives no weight to Kneppers' most recent opinion offered in this matter.

63. Of the different sources of information, the contemporaneous communications among the parties about heat gain, along with the Plaintiffs' interrogatory responses, are the most credible. Collectively, these documents represent what the Plaintiffs themselves believed was the most appropriate allocation of their relative risk based on both the relative responsibility of the different *Beacon* defendants and the relative legal exposure and claims the defendants each faced, which are the requirements for allocation under the Arch Policy. Ex. 3 (Section X). Consequently, the Court finds that the entirety of the MP Parties' contribution to the *Beacon* settlement should be allocated to Heat Gain and that 90% of the settlement payments Zurich, American Guarantee, and Westchester made in *Beacon* should be allocated to the Heat Gain issue.[1]

64. If you attribute 100% of the MP Parties' contribution to the *Beacon* settlement to Heat Gain and 90% of Zurich, American Guarantee, and Westchester's contributions to the

---

[1] Even if the interrogatory responses were not considered, the Court would still conclude that approximately 90% of the underlying defense costs should be attributed to Heat Gain-related claims. Given the state of the record both in this case and in the three underlying actions, and also in light of the outcome of the underlying litigation, which resulted in dismissals and settlements and no actual damages awards, precise calculations regarding the proportion of defense costs (and settlement amount) attributable to Heat Gain are not possible. However, almost all of the contemporaneous evidence suggests that by far the primary concern in the underlying actions was Heat Gain. The strongest evidence of this in the record before this Court is in the letters exchanged at the time by the Wendel Rosen lawyers, who represented the MP Parties, and Arch's defense counsel, who almost exclusively discussed the heat-related issues in the actions and potential coverage for those claims.

*Beacon* settlement to Heat Gain, you arrive at a weighted average of 91%. In other words, on average, 91% of the total settlement $3,775,000 was attributable to Heat Gain. Dkt. No. 121, ¶ 54.

65. Based on the Plaintiffs' liability analysis throughout the Underlying Actions – which indicates that the MP Parties' exposure was exclusively or almost exclusively limited to the Heat Gain issue and that the other defendants in the Underlying Actions would bear responsibility for the remaining construction defects and damage, the Court finds that the allocation of defense costs in the Underlying Action to Heat Gain is a weighted average of 91% of the defense costs in the Underlying Actions.

66. Arch's expert witness, Toshikazu Dezaki, performed an allocation of defense costs in the Underlying Actions and the *Beacon* settlement payments. Ex. 320; Dkt. No. 121. The Court credits Dezaki's report and testimony.

67. Plaintiffs have raised the issue of whether Dezaki assumed that the Zurich and Westchester policies covered the entirety of the Plaintiffs' settlement payments in *Beacon* and defense costs in the Underlying Actions. To the extent Dezaki's analysis assumes coverage under the Zurich Policy and Westchester Policy, that assumption is correct. Both the Zurich Policy and Westchester Policy are CGL policies that include a duty to defend. Ex. 206 at MP000119; Ex. 280 at MP000254. An insurer under a duty to defend must defend the *entire action* as long as the facts allege a claim *potentially* covered under that policy. *Buss v. Super. Ct.*, 16 Cal. 4th 35, 39-49 (1997). After the litigation has resolved, however, an insurer under a duty to defend may recoup the cost of defending against claims that were not even potentially covered, but the insurer can only recover defense costs exclusively attributable to a claim that was not even potentially covered and has the burden of proof on this issue. *Id.* at 39-40. Zurich and Westchester both acknowledged that the Underlying Actions all include claims potentially covered under their respective policies. Ex. 209 at Z004098; Ex. 247 at ARCH0005556. In addition, Plaintiffs' expert determined that the majority of the items of damage claimed by the

*Beacon* plaintiffs included some form of resultant property damage that would be potentially covered under the Zurich Policy and Westchester Policy. Ex. 313. Therefore, the Zurich Policy and Westchester Policy both cover the entirety of the Plaintiffs' settlement payments in *Beacon* and defense costs in the Underlying Actions.

68. The Arch Policy is not a commercial general liability policy and does not impose on Arch a duty to defend. The Arch Policy only requires Arch to pay defense costs for claims that are *actually* covered under the Arch Policy, not defense costs for claims that are merely *potentially* covered. *Health Net, Inc. v. AISLIC*, 206 Cal. App. 4th 232, 259 (2012); *Pan. Pac. Retail Props., Inc. v. Gulf Ins. Co.*, 471 F.3d 961, 970-71 (9th Cir. 2006). *Buss* does not apply to the Arch Policy.

69. The Arch Policy specifically handles the allocation of defense costs and settlement payments where, as here, some claims are not covered under the Arch Policy. Section X states in pertinent part, "If as a result of a Claim an Insured incurs both Loss covered under this Policy and loss not covered under this Policy, either because such Claim is made against both the Insured and others or because such Claim includes both covered and uncovered matters, then such amount shall be allocated between covered Loss and uncovered loss based on the relative legal and financial exposures of the parties to such covered and uncovered matters, and in the event of a settlement, also based on the relative benefit to the parties from settlement of such covered and uncovered matters." Unlike in *Buss*, Arch does not have to prove that any particular defense cost is not even potentially covered. Instead, Plaintiffs have the burden of proving that their payments in the Underlying Actions are for matters actually covered by the Arch Policy based on the MP Parties' relative legal and financial exposure. *Pan. Pac.*, 471 F.3d at 970-71.

70. The Zurich and Westchester policies also contain an allocation provision. The allocation provisions in the Zurich and Westchester policies are identical and are found in a subsection of the "Other Insurance" provision of the policies, entitled "Method of Sharing." The "Method of Sharing" provision in both policies provides: "If all of the

17

other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers." Ex. 206 at MP000130 and Ex. 280 at MP000242.

71. Arch argues that any losses not allocated to claims relating to Heat Gain would not be covered, because any remaining claims would be "construction defect" claims that fall outside the policy. However, not all remaining claims were construction defect claims, so even if construction defect claims fell outside the policy, Arch is incorrect that all non-Heat Gain claims fall outside the policy. Moreover, the Court ruled at summary judgment that negligence claims were covered. Dkt. No. 64. Because Arch has not proposed an allocation based on anything other than the distinction between Heat Gain claims and non-Heat Gain claims, that distinction forms the basis for the allocation and calculation the Court performs.

Calculations

72. As discussed, above, the total defense costs paid by the plaintiffs in the underlying actions were as follows:
    a. MP Parties: $743,692.43;
    b. Westchester: $1,755,551; and
    c. Zurich: $2,339,696.

This means that total defense costs in the underlying actions were $4,838,939.43. Attributing 91% of these payments to Heat Gain-related claims means that 9% of these defense costs are not related to Heat Gain. Nine percent of $4,838,939.43 amounts to $435,504.55 in covered defense costs.

73. As discussed above, the total settlement amounts paid by the plaintiffs in the underlying

18

actions were as follows:

   a. MP Parties – $300,000;

   b. Zurich – $995,000;

   c. American Guarantee – $305,000; and

   d. Westchester – $2,175,000.

Of this, the entirety of the MP Parties' contribution and 90% of the insurer plaintiffs' contribution are attributable to Heat Gain, meaning that $347,500 is attributable to issues other than Heat Gain. Dkt. No. 121, ¶¶ 35-64.

74. The amount of allowable damages must be allocated amongst the different insurance carriers to determine Arch's responsibility of the allowable damages. A policy limits allocation is the most appropriate method of allocation because it most closely aligns with the relative risks the insurance carriers respectively contractually agreed to accept and also because the terms of the different policies require allocation based on the relative policy limits. Ex. 3 (Section X); Ex. 206 at MP000130; Ex. 280 at MP000242. Because Arch's policy has a $2,000,000 policy limit and the combined limits of the Arch, Zurich, and Westchester policies is $8,000,000, Arch's proportionate share of the allowable damages is 25%. Consequently, Arch's share of the *Beacon* settlement and the defense costs in the Underlying Actions is 25% of the sum of $347,500 and $435,504.55, meaning, 25% of $783,004.55, which comes to $195,751.14.

75. Section VI of the Arch Policy states that Arch "shall only be liable for the amount of Loss as a result of each Claim which is in excess of the applicable Retention amount stated in Item 4 of the Declarations, such Retention amount to be borne by the Insureds and shall remain uninsured." The Retention amount for Coverage C is $75,000. Ex. 3. Because the Retention was never satisfied, Arch's liability to Plaintiffs must be reduced by $75,000. Plaintiffs concede that any liability must be reduced by the $75,000 Retention. Dkt. No. 105 at 6:16. Consequently, Arch is responsible for $120,751.14 of the total amount.

Judgment

76. Accordingly, judgment will be entered for the plaintiffs on their coverage claim in this amount. The parties are ordered to submit a proposed judgment within 7 days of this order. If the parties disagree about the amount of interest to be awarded, they can submit competing proposed judgments, along with an explanation, not to exceed two pages each, of their position.

**IT IS SO ORDERED.**

Dated: August 17, 2018

VINCE CHHABRIA
United States District Judge